17-1378. May it please the Court. My name is Robert McGuire, and I represent the plaintiff appellant, Mindy Armstrong. We are asking the Court today to reverse the summary judgment below on the FCA, the False Claims Act, and the NDAA, National Defense Authorization Act, claims, and return the case to the District Court so that Ms. Armstrong can take her case to a jury. This is not a case where summary judgment, in our view, is appropriate because the District Court essentially did not view the facts in the light most favorable to Ms. Armstrong. The other thing the Court did is it really conflated the False Claims Act claim and the NDAA claim. It's not necessarily the District Court's fault because the briefing in the District Court really conflated it as well. Yeah. In this Court, too, I wasn't sure what the difference is. So the False Claims Act retaliation provision, Section 3730H, protects you against any, protects the relator or the person who might be a whistleblower against retaliation for bringing potential violations of the False Claims Act to the attention of the employer. The NDAA protects the employee, the employee against, a contractor employee specifically, against retaliation for bringing violations of the law to the attention of the employer. And so whereas the FCA claim, the protected activity in the FCA claim is cabined really to violations that might go to a breach of the FCA, under the NDAA it's any rule, regulation or law that is related to a Federal contract. And the way the District Court decided that question with respect to the NDAA claim was really there was only one ground that she used to decide that, and that was her decision that the Federal leases in question weren't Federal contracts. And she made, in her discussion of that point, she emphasized that these leases were leases between government agencies. And that's factually wrong. In the NDAA cases, sometimes the named defendant is a governmental agency? No. In the NDAA case, no, no. No, they're not. The government's immune. So it doesn't change. If that's the problem, it doesn't change that. That would be correct. Our view is that it's not a problem because the NDAA is specifically a cause of action against the contractor. So, but just to finish that thought, the contracts in question, the Federal leases, there are two different contracts that could be at issue at an NDAA claim. You have the leases between the BLM and private landlords, which are called direct leases, and then you have other leases which are actually government-to-government leases where the BLM leases space from GSA. But your client doesn't allege any errors or falsifications in those leases, does she? Not in the underlying leases themselves. Right. So what she's arguing is that they did other fraudulent stuff that misrepresented the contents of the leases to another governmental agency. Yes. Okay. That doesn't sound to me like an NDAA claim based on that contract, the leases. Well, first of all, there's very little case law construing the NDAA, as the Court, I'm sure, is aware. But the way that plain text of the statute reads, it's a violation of law, rule, or regulation that's related to a government contract. And so the violation of law here, in Ms. Armstrong's view, is the falsification of information in a report that's being used to report up the chain, to fill out information for the Federal Real Property Council survey, and to keep track of the portfolio of BLM properties. So the violation of law is the false reporting of information. But I thought you were essentially conceding there wasn't a violation of the FCA here. The only question is, the only thing relevant to the retaliation claim is whether she had a reasonable basis for thinking there was a violation. Do you actually think there was a violation here? I do. I do think there's an arguable violation of the False Claims Act here, yes. But you're not bringing a claim under the False Claims Act. She did not bring a false claims case. That's correct. So all you need to show is that there was an arguable ground, not that you're right about. Correct. And that goes with the Supreme Court case of Graham, which basically says you don't have to prove a violation of the False Claims Act. And this whole interpretation of — But it's not subjective. It's objective, right? A reasonable person has to have been — have a reasonable belief that there was a violation. I believe it's a combination of subjective. It has to be a subjective component and an objective component. Well, you have to personally believe, but your belief has to be reasonable. Yes. Well, it's kind of a strange form of objectively reasonable because it's — it's Would another employee in your shoes, knowing what you know, possibly feel that your employer might be violating the False Claims Act? That's the objective test, the way other circuits have formulated it. And this circuit hasn't yet. Well, in your shoes means having the same understanding of the facts. Correct. That's all. Right. And presumably the same background knowledge as Mindy Armstrong had of the relevant regulations from her time working as a lease administrator contractor at NOAA. But that element of the claim was not the basis of the summary judgment. It was the failure of causation, essentially. Is that correct? Yes. The district court ruled — based the ruling on causation and then expressed some doubt as to whether there was a protected activity under the False Claims Act. And so those are really two — she didn't base her summary judgment on the lack of a protected activity. She assumed arguendo that there was protected activity. But her reasoning really collapsed this objective reasonableness requirement into whether she's right. Okay? So she seemed to analyze objectivity, the objective reasonableness of whether she suspected a violation, with the question of whether she's right about whether there's a violation. And those two things can't be conflated because it completely destroys the requirement in Graham that you don't have to prove a violation. But I thought that part of the district court's decision was that the adverse employment action here is when she was terminated by TAG, not when she was — the BLM said she should be reassigned or they didn't want her anymore, and that there wasn't — that she didn't have any evidence that Mr. Cota, who independently made the decision to terminate her employment with TAG, had knowledge of whatever alleged protected activity she claimed. Yeah. There are a couple points in there that I'd like to address. So first of all, the adverse action of removing her from her assignment to BLM very clearly falls within the definition of retaliation that the FCA defines. A retaliation claim against TAG? Yes. I mean, they didn't remove her. The BLM said we don't want to work with her anymore. The BLM requested her removal. But the BLM did not have unfettered discretion to essentially remove her at will. There were — I thought they had a contract, right? They did. To say that person's not going to work for us. The BLM had a contract, and the contract said you can — the BLM can — it specifically addressed the point. And it said the BLM can request a contractor's removal for three things, failure to abide by professional performance or some other standard, none of which are implicated by reporting potential fraud against the government. None of — it's not even — It's not even at the department, and that is that — the nonprofessional conduct and everything, it just — if a specific reason was not communicated to TAG. Do I have those unsweetened facts wrong? The — when Stephen Koda — according to his testimony, when Stephen — now, we — and we don't — our position is that, Stephen, there's evidence in the record from which a jury could reasonably infer Stephen Koda actually knew that there was no fraud. This is your cat's paw. No, not the cat's — well, the cat's paw is a different way to get there, but it's not the cat's paw. It's the circumstantial evidence that relates to the fact that — But your client testified at her deposition she had no reason to disbelieve Koda when Koda said, I didn't know. Right. And he denied knowing. So what's your evidence that he knew? The fact that some other person from TAG was working at the — for the government agency? No. The evidence is that Koda himself affirmatively testified that he was researching concerns Mindy had about space management. But she, in her response to request for admission number eight, she indicates that she told Koda, told him about her concerns at the BLM on September 29th, 2014, but she did not in any way suggest that there was any fraudulent activity. She just had concerns about what the proper way was to do these lease assessments. That — I mean, isn't that pretty good reason for him to be researching it without any evidence of fraud or protected activity? By his own testimony, the questions that he was researching were related to the fraud allegations that she had discussed with him at her exit interview. And he had already been looking into those. And so — Okay. But her exit interview was after he decided to fire her. It was — So if he learned something at the exit interview, that's irrelevant to the reason for being fired, is it not? I don't think it is irrelevant that he learned it, because if he learned it after the decision was made, but before the firing was completed, it's not irrelevant that he learned that there's a retaliatory motive. Well, no. I mean, you can't say the retaliatory motive had much effect if the decision had already been made, and now you've got an additional reason to fire her. That's not a ground for a claim, is it? A reasonable juror could conclude from the circumstances that Coda knew she was being fired for an improper reason. Tina Hamillack was unwilling to tell him why she was being removed. He knew she had been researching — she had been researching — or she had raised these questions about space management. He was in constant communication with Barbara Bernstein, who herself was the person who had been accused of fraud and who had initiated this whole issue. And so you're asking us to speculate that Bernstein told him even though she said she — even though he says she didn't, and your client said she has no reason to not believe Mr. Coda when he says he didn't know. Absolutely not. I'm not asking this Court or the trial court to speculate. What I am asking is to allow us to go to a jury and argue to a jury verdict. I'm not going to speculate. Well, because there's a difference between circumstantial evidence and speculation. Circumstantial evidence is evidence just as much as direct evidence, and you can infer from circumstantial evidence anything that a reasonable person would be able to infer. And the question for us is, is it really reasonable to infer that from this evidence? Don't you need a little more evidence? I'm kind of on the speculation side of this at this point. It doesn't sound like much. To answer that, I think you need to mind this area of the research that Coda was doing. Right. That's his source. That is exactly right. I mean, there's — the context here is that Steve Coda and Barbara Bernstein were very tight. They talked about everything, including trivial stuff, whether Mindy has a computer or not. It's simply implausible to believe that that conversation didn't happen when Ms. Bernstein told her BLM supervisor that she had been accused of fraud, when she then went and complained about Mindy's dress code violation after this arose. There was obviously communication between Bernstein and Coda about other stuff. Coda testified that he was researching these questions. He said in his deposition that it related to Mindy's — the reason Mindy was terminated. And so — But he never said it related to fraud allegations. I don't remember that from his deposition. He was asked about an e-mail she sent the day — two days after she was terminated. She sent him an e-mail to elaborate on their discussion. She identified things that she had — were examples of falsification of data. When he was questioned about that e-mail, he said, this is what I was — this is what I was looking into. Right. But he never — there's nothing in his deposition that suggests that, oh, yeah, that refreshed my recollection. She did tell me that she had accused him of fraud. No, no. He did not. I mean, his position in his deposition was that he didn't know. That was his position. And the problem is, he's the only person able to testify on that. We can't — unless he's going to contradict himself. Anybody who told him would be in a position to say that. He couldn't have done it without someone telling him. And you don't — we don't have anyone saying they told him either, do we? We served a subpoena on the BLM to depose Terry Baker. And the district court quashed that while this was pending. So we never had the chance to do any discovery of anyone other than Stephen Cota, who would know about it. Terry Baker — He filed a 56-F motion. We — I think — We had done — we did a two-year request to the BLM. They denied it. We then served him the subpoena. The DOJ came in and moved to quash. And that was pending when these motions were fully briefed. And then it was — Well, if you need more evidence, what Judge Murphy is saying, if you're — if you cannot properly respond to a motion for summary judgment because you haven't been allowed enough discovery, you need to file a motion under — at one time it was 56-F, but maybe 56-something. G-E-F-F. G-E-F-F, maybe. Right. Anyway. I mean, the — But you didn't do that. Well, we didn't because the discovery had been — had been stayed, first of all. And I believe the discovery had been stayed. But, you know, because the decision on the subpoena came out after we had had this motion for summary judgment fully briefed, we, you know, at that point — That's when you filed the motion. — it was submitted. Okay. What does Burns-Fink say? Burns-Fink's now an employee at BLM, and she's also unable to be subpoenaed except with BLM's permission. And that has been true since before the lawsuit was filed. So I have 38 seconds I'd like to reserve for rebuttal. Actually, you're over 38 seconds. We'll see how it goes. Thank you, Your Honor. May it please the Court. My name is Shanda Felkamp, and I represent the defendants in Appalee, the Arcanum Group, also known as TAG, in this appeal. TAG urges this Court to affirm the district court's grant of its motion for summary judgment. Why don't we start where he left off? Sure. Because I think that's probably what he — maybe all he's got going is that there was sufficient evidence for a reasonable jury to infer that CODA actually had been informed of why the agency let the plaintiffs go. How do you respond to that?  Oh, really? Yes, Mr. — knowledge is one aspect of the causation test, and both of these statutes require it. Here, as you guys pointed out, it's important to distinguish between the two adverse actions that happened here. And one was the BLM's adverse action in advising TAG that they were withdrawing their consent to her filling that role and instructing them to remove her. The second adverse action happened after TAG, looking at its roles and figured out that he doesn't have any place to place her, and then decided to terminate her employment because of lack of work. And I think his position is that the agency could dismiss her, in a way, only on certain grounds, and CODA could have protested those grounds. If he had been told what the ground was, he would have known that that was improper and could have protested it, and therefore, in a way, he caused her to leave the agency, which caused him to have to fire her because there was nothing else for her to do. So it really — I think the heart of the argument is there's enough evidence here to show that CODA — for a recent person to believe that CODA was told to reason why the agency let her go. Well, he was told by Tina Hamillack, who's the administrator of the contract for the BLM, that they wanted — that she wasn't working out and they wanted to let her go. He understood that to mean that they were invoking this contract provision that says they can terminate her for personal, professional, performance, pretty much any reason. He did ask her. She refused to provide any information about any reasons for their decision, and then made his decision after looking at their roles. Now, as far as his knowledge, it's undisputed here that he had no knowledge of her accusations against the BLM. Well, I'm not sure — I mean, is it fair to say it's undisputed? I mean, they're certainly disputing that. They're saying that the evidence that he researched legal issues related to the calculation of the lease space is evidence that he was aware of the allegations that Ms. Armstrong made against people at BLM. So the evidence is very clear that plaintiff didn't tell him that she had made accusations against the BLM, and that she didn't tell him anything about falsification of data and all of the other things that she raised. And so what he testified to was that he was researching space allocation. Very general thing to be — unless someone had told him that there had been an allegation that BLM was not properly assigning square footage to these leases. So his testimony was that he was researching space allocation due to questions plaintiff had asked. And so she's clear that she didn't tell him about falsification of data. And so what — you know, this is also speculation because the question wasn't asked on the follow-up there. But the answer — his answer is that she asked questions, general questions, about space allocation. At what point? How long before she left BLM do we know? We don't know the answer to that. She was only there for less than three months. So the timing is pretty tight here regardless. But, yeah, so at some point she asked him, according to his testimony, she asked him questions that related to space allocation management. So he's looking into it just generally to have some information about it. And the suggestion is the inferences that they were mucking around with space allocation so they could hire more employees. Well, that's not what his testimony was. His testimony was that it was just questions she had asked about space allocation management. So he's looking into it just basically to get some information. She acknowledges that she had — that she asked him about space allocation. Is that correct? That I don't know if she acknowledged at all. Well, the question was whether she had asked or informed him that she had discovered falsification of data, that she was — had accused the BLM of falsification of data, and her answer to both of those was no. But she did — she did admit that on or about September 29th that she had asked him, expressed some concerns about — about how space allocations were being done. Right. And so — In a — in a response to a request for admission, right? Right. And I think those were the general questions. She clearly, though, did not alert them to falsification of data, that she had accused anybody of falsification of data. And that's what's required to put any employer on notice that they engaged in some sort of protected activity. Questions about space allocation management, you know, that's — that doesn't raise to the level of protected activity here. Well, that's what the whole issue — the whole issue was about, was space allocation. And the question is, were they mucking around with it for bad reasons, right? Well, what she has alleged was that — I'm giving you an opportunity. Right. What she has alleged is that there was some — that there was a conversion factor, that they used — the old leases used to have the usable square feet, now the GSA requires rentable square feet, that there needs to be a conversion to make that happen to fulfill these reports. Did she indicate that this question of allocation was related to a misuse of internal funds? No, I don't believe she did. And certainly there's no testimony to that fact. And September 29th was the exit interview, is that right? No, Your Honor. The — the exit interview, she was terminated on October 3rd. Oh, okay. And so this is a week or so in advance. She was in, I think at that point, the testimony that she was in the midst of preparing some of these reports that are at issue. So they gave her the exit interview, and then she exited? Correct. That was the end of that. And that was not the same day? What was not the same day? Sorry. She was not terminated on the day of the exit interview because she had further work to do? No, she was. She was terminated by TAG. The BLM notified TAG that it was instructing TAG to remove her from the contract. Do you know the date of that? That's October 3rd as well. And so from that point, Mr. Cota for TAG, researches in his roles and things, whether he has any available position for her, finding that he did not, found that he had no available work for her and had to terminate her. They called her in. On what date did he terminate her? October 3rd. Same day? Same day. And so, yes, then they called her in. He terminates her. They conduct an exit interview. That's when his first being alerted to this falsification of data accusation against the BLM. So this is all in one sitting. We're sitting there together. And you fired and then we'll proceed now to the exit interview, right? Yes, Your Honor. Well, and he had the authority to fire. He did, yes. If he finds out something during that exit interview, then they inherently have the authority to rehire her. Well, he made his decision prior to learning any of that. But it's moments, though, because they were sitting in the same room. They don't even get up and have a coffee break. Same time. Correct. That is true. What matters is when he made his decision, did he have that information? Because you can't make a decision based upon information you learn after the fact. Now, technically, he has the authority to reverse that position, but the law does not require him to do so. Well, the point is that you can't say that this information caused him to fire her when he had already made the decision to fire her. Correct. Now that you have an improper reason to fire her, so you have to reverse your decision that was based on proper grounds, that's not the law. That is not the law. You're right. And that's an issue that was raised for the first time in the reply brief on appeal. That was mentioned. And so it would be our argument that that argument is waived. We brought it in our defendant's motion for summary judgment. Bless you, Your Honor. That in our motion for summary judgment, we mentioned that, we mentioned the cases that do not require an employer who makes a legitimate termination decision to reverse. And we brought that forward. That was not disputed, and that issue was not raised by opposing counsel in their response to our motion for summary judgment. We talked a little bit about the imputing some knowledge to Mr. Koda. There's a lot of speculation about how he might have found out. You know, he specifically testified that Ms. Bernsfink had no input, that no one from the BLM told him that she had engaged in protective activity, had accused anybody of fraud. There's also discussion in opposing counsel's brief about constructive knowledge or imputed knowledge, and that very specifically ignores the law of retaliation, which requires the decision-maker's actual knowledge. Getting into the Catspaw argument, the Catspaw argument doesn't apply here. Well, the argument that they're trying to make is that two BLM employees were the people who were the Catspaw into the decision of Mr. Koda. I've never seen a case like that. Correct, Your Honor. And we have cited some cases that, now, they're from other courts, but, you know, this circumstance doesn't come up very often. But when, in considering the circumstances very similar to ours, where it's a contractor who provides the information, they have found that the Catspaw doesn't apply there. Did BLM have a right to fire her without question or remove her from the BLM project without question? They didn't have to have any grounds. They could just have her removed. Did TAG have any option to leave her working at BLM? No. And in our position, you know, it does say that for personal professional performance reasons. Basically, our position is that covers everything. Is there any mechanism for TAG to say you've improperly released one of our people? There's only a clause somewhere in there that says they can ask for interpretation of a contract provision. They can ask for what? An interpretation of a contract provision, like if they don't understand that it's not a meeting of minds on the contract words. Is that enough that they can ask why the person is being asked to be removed? Maybe. And he did. But they got nothing in their business for the answer. Basically, yes. And, you know, basically that she wasn't working out. And he understood that to mean that she's not meeting these standards, that she's not working out for them, and that she needs to go from their perspective. And so then he took the steps he needed after hearing that from them. And as far as I think your question also asks whether there's any mechanism for TAG to do anything about it, you know, in practicality, they can't force the BLM to retain her. There's no contract provision that allows them to appeal a decision, anything along those lines. So no. And it looks like I'm out of time. So thank you, Your Honor. Thank you. You're out of time. How much do you want? A minute and a half. 30 seconds. So first of all, it's not viewing the facts in the light most favorable to Ms. Armstrong to assume that her conversation with Steve Cota on September 29th dealt with the same thing that Steve Cota himself actually said related to her fraud claims in his deposition. But Ms. Armstrong denied that. She said she didn't talk to him about fraud. She said she didn't talk. That's exactly correct. She said she didn't talk to him about fraud. She didn't talk to him about fraud before she was terminated. And so when he was researching things that had to do with her accusations of fraud, a jury could infer that means. She said she talked. Never mind. She said that she answered a request for admission, which I'm sure you're familiar with that answer. Yes. Saying that she related her concerns about how the space was calculated. But in her deposition, when she was asked and she said, I did not tell him that I was concerned about fraud or, you know, misrepresentations or anything like that. And that's my recollection of the record. Sure. And a jury may conclude that. But under the summary judgment standard, that's a decision that should be made by a jury because the facts have to be viewed in the light. Well, when you're on trial, you should be viewed in the light. It's undisputed what she said in the admission and in her deposition. That's undisputed. It's it is undisputed that she raised questions about space management. Yeah. But not fraud. But he put himself said that the questions he was researching were the ones that had to do with her fraud claims. He said that in his in his deposition. So the fact that the phrase is being used, space management is being used in common with both does not mean that they are the same. Is he doing this research before October 3rd? He was. Yes, he was. He said he was already doing it when she was in there to have her exit interview. You've used a minute and 45 seconds. Thank you, Your Honor. As I expected. Sorry. You will be under supervision for another minute. Thank you, counsel. In case the counsel is excused, court is in room 9 tomorrow morning.